*E-Filed 3/9/12*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EK VATHANA, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>EVERBANK, a/k/a EVERBANK DIRECT, a/k/a EVERBANK FEDERAL SAVINGS ASSOCIATION; EVERBANK FINANCIAL CORPORATION; EVERBANK WORLD MARKETS; and DOES 1 through 25,<br><br>　　　　Defendants.<br>　　　　　　　　　　　　　　　　　　／ | No. C 09-2338 RS<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiff Ek Vathana, representing a certified class of investors, brings this action based on his purchase of two certificates of deposit (CD) denominated in Icelandic króna (ISK) from defendants EverBank, EverBank Financial Corporation, and EverBank World Markets (collectively "EverBank"). Vathana alleges that EverBank's decision to close his CDs on their respective maturity dates rather than roll them over amounted to a breach of contract. EverBank maintains its action was authorized and compelled by the banking crisis that gripped Iceland in October of 2008. The parties have filed cross motions for summary judgment on this issue. The motions are suitable for disposition without oral argument, pursuant to Local Rule 7-1(b). In consideration of the

arguments raised in the parties' briefs, and for the reasons stated below, defendants' motion must be granted, and consequently, plaintiff's motion is denied.

## II. FACTS

Beginning in 2007, Vathana and his fellow class members invested funds in CDs marketed by EverBank as the WorldCurrency CD. This product permitted investors to deposit United States dollars (USD) with EverBank, in exchange for a CD of equal value, denominated in a foreign currency (including ISK) of the investor's choosing, with a term of three months until maturity. WorldCurrency CDs thus returned interest on the principal deposit, and were subject to the fluctuating value of the underlying foreign currency. These transactions were governed by an "Account Disclosures and Terms & Conditions Agreement" (hereinafter the "Agreement"). (*See* Compl., Ex. B).

Under that Agreement, investors ordinarily enjoyed three options once their CD reached maturity. They could (1) liquidate the CD, (2) receive the interest and re-invest the principal, or (3) rollover the CD and its proceeds by re-investing in the same currency for the same maturity at the current prevailing interest rate. (Agreement, ¶ 2.7.10). Unless EverBank received instructions to liquidate an investor's CD, however, the default was to rollover the CD at maturity. *Id.* Approximately 30 days before a customer's CD was set to mature, EverBank sent him or her a standard maturity notice, with a reminder: "If we do not receive maturity instructions from you by the Friday prior to maturity, your CD will automatically be reinvested, including principal and interest, to a CD of the same currency and maturity, at the current prevailing interest rate." (Vathana Decl. in Supp. of Pl.'s Mot. for Summ. J., Ex. A, at 1).

As plaintiff stresses, these transactions are executed as "book entries" on EverBank's ledger. If a customer selected a CD denominated in ISK, EverBank did not actually convert the deposited USD to ISK, and hold that physical currency in a segregated account. Rather, it placed the deposit in its general treasury and obtained a corresponding forward contract from a financial intermediary, such as JP Morgan Chase, promising to deliver the amount of foreign currency due to EverBank's customer at the time of maturity. These forward contracts thus hedged against exchange rate-related risk by enabling EverBank to obtain a set amount of foreign currency at a given time for a fixed

price, based on the "wholesale spot rate" (e.g., existing wholesale exchange rate) available at the time of contracting.[1] Traditionally, the forward contracts also paid EverBank "points," which provided greater amounts of foreign currency than EverBank originally purchased, ultimately allowing it to pay greater interest spreads to CD holders.

Beginning in 2007, Vathana obtained a WorldCurrency CD denominated in ISK. It rolled over a number of times, such that by July18, 2008, Vathana had invested 9447.49 USD in CD # 6207226771, resulting in an account balance of 743,045.22 ISK. On September 5, 2008, he had invested another 40,040.07 USD in CD # 6207332237, valued at 3,525,527.75 ISK. These deposits were set to mature three months later, on October 22, 2008, and December 10, 2008, respectively. On October 20, 2008, days before CD # 6207226771 was set to mature, Vathana sent EverBank a message using its internal, web-based messaging system instructing it to "rollover the CD into the new ISK 3-month term," and stating, "I will not accept a forced liquidation conversion. If you choose to close my accounts, I demand you send me the actual physical ISKs." (Compl. ¶ 25). Notwithstanding these instructions, EverBank declined to rollover Vathana's CD at maturity and instead converted his deposit, then worth 747,676.53 ISK, into 2,958.03 USD, at a rate of 252.7616 ISK per USD. Consequently, Vathana received substantially less USD than he originally invested, and a note from EverBank explaining: "ISK CD closed due to currency markets." (Vathana Decl. in Supp. of Pl.'s Mot. for Summ. J., Ex. C, at 1).

According to EverBank, it was forced to close class members' ISK-denominated CDs to protect both itself and them from losses, in the face of the turmoil that gripped Iceland's financial system and currency in October of 2008. EverBank states that it repeatedly advised customers to close or sell ISK-denominated CDs in order to avoid losses, beginning in April of 2008, and lowered the interest it paid out on ISK-denominated deposits. It alleges, and Vathana does not dispute, that its customers lost approximately $47 million in ISK-denominated CDs between May and October of 2008.

---

[1] According to EverBank, these forward contracts were also necessary to comply with its internal safety and soundness principles. Absent a waiver from the firms' Assets and Liabilities Committee, it could not hold more than $350,000 of a single foreign currency at any given time without a corresponding forward contract or other hedging instrument to insulate it from currency-related risk. (Trotter Decl. in Supp. of Defs.' Mot. for Summ. J. ¶ 17)

Some background on the severe monetary crisis is necessary to explain how this could have occurred. In October of 2008, Iceland faced a severe monetary crisis, which threatened the value of the ISK. These "unusual and extraordinary circumstances on the financial market" prompted the Icelandic government to enact emergency legislation permitting it to place the country's national banks in receivership.[2] (Defs.' Req. for Jud. Notice, Ex. B., at Art. 1). Iceland's Financial Supervisory Authority thus effectively took control of the country's three largest banks from October 7-9, 2008. (*See* Defs.' Req. for Jud. Notice, Exs. C, D, E). Following this action, EverBank alleges it attempted, but was unable, to find any counterparties willing to enter into forward contracts for ISK. Likewise, EverBank avers it could not find any current prices for ISK in the financial markets. Accordingly, EverBank's executives decided to liquidate all CDs maturing on October 8, 2008, convert the proceeds back to USD based on wholesale spot rates, and return the remaining funds to customers.

On October 10, 2008, Iceland's Central Bank issued a memorandum to all depository institutions apparently aimed at stemming the withdrawal of assets, particularly in the form of foreign currency. Among other things, it mandated that "[b]anks should avoid using foreign currency that is received in the banks for financial-related currency transactions of any sort." (Defs.' Req. for Jud. Notice, Ex F., ¶ 4). Vathana accepts that this limitation prevented Icelandic banks from releasing foreign currency as payment in connection with financial transactions, but maintains that it did not prevent EverBank from purchasing ISKs from the banks in exchange for

---

[2] Defendants move, unopposed, for judicial notice of: (1) remarks made by Iceland's Prime Minister, available on his administration's website, (2) Iceland Act No. 125/2008, permitting the government to assume shareholder power over national banks, dismiss their boards of directors, and appoint receivership committees in their stead, (3) official notices of the Financial Supervisory Authority's decision to exercise this option under Act No. 125/2008, and (4) a memorandum issued by the Central Bank of Iceland to all depository institutions. As this Court's prior Order of March 15, 2010, explained, courts of this Circuit have held that information available for the public's review on government websites satisfies the judicial notice requirements of Federal Rule of Evidence 201 because such information is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonable be questioned." Fed. R. Evid. 201(b)(2); *Victoria v. JP Morgan Chase Bank*, No. 09-2059, 2009 WL 5218040, at *2 (E.D. Cal. Dec. 29, 2009). Accordingly, defendants' motion for judicial notice is granted. Plaintiff has also filed an unopposed motion for judicial notice of (1) various documents already part of the record in this case, (2) the aforementioned memorandum, and (3) official exchange rates published by Iceland's Central Bank. There is no need to take judicial notice of documents in the record and notice is taken of the memorandum for the reasons stated above. Official interest rates posted by the Central Bank are also suitable for judicial notice under Federal Rule of Evidence 201(b)(2); in this respect, plaintiff's motion is granted.

USD. EverBank does not disagree, but asserts that it could not simply wire for ISKs from Icelandic banks because it lacked an account with those institutions necessary to complete the transaction. EverBank also notes that it could not simply hold sufficient ISKs to fund all outstanding CDs without running afoul of its own internal safety and soundness principles, absent some hedge.

EverBank also insists that it was unable to find any wholesale spot price for ISK, for the purpose of exchanging the proceeds from matured CDs for USD, until October 23, 2008, when it finally located a counterparty willing to purchase ISK for USD through an intermediary, at a rate of 252.7616 ISK per USD. Rather than close all ISK-denominated CDs regardless of maturity, EverBank decided to liquidate only those deposits that had reached maturity, in the hope that a market for ISK with more favorable exchange rates would eventually re-emerge. For CDs that matured on November 5, 2008 or later, EverBank did in fact find more favorable wholesale spot rates. The market for forward contracts never recovered, however. EverBank was able to obtain only a single forward contract after Iceland's banks were placed in receivership. As a result, EverBank decided to close all CDs maturing between October 8 and December 31, 2008, convert the proceeds into USD, and return those funds to investors.

Vathana claims this constituted a breach of the Agreement. He argues EverBank was obligated to rollover mature CDs per investors' instructions. EverBank insists otherwise. It maintains that the Agreement's clause majeure bars plaintiff's breach of contract claim. That term provides:

> Neither You nor EverBank shall be liable in damages for any delay or default in performing hereunder if such delay or default is caused by conditions beyond our control including, but not limited to … government restrictions … and/or any other cause beyond the reasonable control of the party whose performance is affected. We may close your non-U.S. dollar account(s) … or … convert them to U.S. dollars at anytime if we deem such action necessary, in our sole discretion, in response to … government restrictions … and/or any other cause beyond the reasonable control of us.

(*See* Agreement ¶ 1.32). EverBank contends that it additionally retained the right to close class members' accounts under Paragraph 1.17 of the Agreement. That term, entitled "Amendments and Termination," states, in relevant part:

> We may change any term of this Account Agreement. … [W]e will give you reasonable notice in writing or by any other method permitted by law. We may …

> close your deposit account(s) with us at any time upon reasonable notice to you and tender the account balance to you by mail. If we believe that it is necessary to close your account immediately in order to limit losses by you or us, we may close your account prior to providing notice to you.

(Agreement ¶ 1.17). The question posed by the parties' cross motions for summary judgment is therefore whether or not EverBank's decision to liquidate class members' ISK-denominated CDs constituted a breach of the Agreement. Determination of that issue will resolve Vathana's sole claim for relief.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant succeeds, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Celotex*, 477 U.S. at 323. A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). Irrelevant or unnecessary factual disputes do not preclude entry of summary judgment. *Id.* at 248. In evaluating each party's motion, the Court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id.* at 255.

### IV. DISCUSSION

Assuming EverBank ordinarily would have been required to honor investors' instructions to rollover CDs at maturity, pursuant to Paragraph 2.7.10 of the Agreement, the question presented by the parties' cross motions is whether or not EverBank was released from doing so by either Paragraphs 1.17 or 1.32. The parties agree that Florida law governs interpretation of the Agreement. Under the law of that state, the elements of breach of contract include the existence of a valid contract, material breach, and damages. *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. Dist. Ct. App. 2000). Here, the parties focus on breach, and consequently, interpretation of the contract. Under Florida law, language that is clear and unambiguous may be interpreted as a

No. C 09-2338 RS
ORDER

6

matter of law. *Smith v. Shelton*, 970 So. 2d 450, 451 (Fla. Dist. Ct. App. 2007) (citations omitted). Applying Florida law, and for the reasons discussed below, EverBank's decision to liquidate investors' ISK-denominated deposits was at least supported by Paragraph 1.17.[3] As noted above, that provision permits EverBank to "close … deposit account(s) … at any time upon reasonable notice to [its customers]." (Agreement ¶ 1.17). It also provides that if EverBank "believe[s] that it is necessary to close [a customer's] account immediately in order to limit losses by [the customer] or us, we may close [the customer's] account prior to providing notice …." *Id.* EverBank submits this is precisely what it has done in the present case.

Somewhat confusingly, Vathana begins by arguing that EverBank's decision to liquidate ISK-denominated CDs was not a valid "amendment" of the Agreement, and therefore was not authorized under Paragraph 1.17. In the alternative, supposing it is an amendment, he goes on to argue that EverBank failed to comply with federal law requiring notice by depository institutions of changes made to account policies. *See* 12 U.S.C. § 4305(c) (requiring written, mailed 30-day advanced notice to account holders for any adverse change made to a term or condition, including "renewal policies for time accounts"). This highly-strained line of analysis is easily dispatched, as it lacks any basis in law or fact. The text of the Agreement was not changed, and EverBank has never suggested that its decision to liquidate CDs somehow amended the terms of the Agreement. Consistent with common sense, rather, EverBank asserts that the liquidation was simply a closure or "termination" of the deposit accounts, within the meaning of Paragraph 1.17. Although Vathana appears to argue that EverBank was obliged to give him and other class members statutory notice regardless of whether the liquidation constituted an amendment or a termination, § 4305(c) applies only to changes to the terms of the Agreement. EverBank purported to exercise its rights under the unchanged language of Paragraph 1.17, therefore § 4305(c) is inapplicable.

At most, EverBank was required to give "reasonable notice" prior to closure, under the stated terms of Paragraph 1.17. Alternatively, if EverBank deemed account closure "necessary" to protect itself or the account holder from losses, Paragraph 1.17 authorized account closure prior to

---

[3] It also appears highly likely that EverBank's decision to liquidate ISK-denominated CDs was authorized under Paragraph 1.32, however it is unnecessary to reach that question because of the finding, explained below, that Paragraph 1.17 supported EverBank's action.

notice. Although there appears to be some question as to whether EverBank provided investors with effective notice of its decision to liquidate the CDs via informal emails prior to doing so, even assuming it did not, as Vathana maintains, Paragraph 1.17 does not require it. Instead, provided a belief that closure is "necessary" to avoid losses to either party, EverBank is clearly authorized to close deposit accounts immediately, and *then* provide "reasonable" notice to the account holders. Even viewing the facts most favorably to plaintiff, that is precisely what it did. On October 22, 2008, it liquidated Vathana's first CD into USD, and deposited those proceeds in another money market account he held with EverBank. Thereafter, he received a notice informing him of the firm's decision.

Vathana goes on to attack the substance of Paragraph 1.17 as unfair because, he believes, it affords the bank far too much discretion, and allows it to pursue its own best interests at the expense of account holders. Paragraph 1.17, on its own terms, does not articulate any check against EverBank's discretion to determine whether closure is "necessary" to avoid losses. As defendants point out, Florida also does not place "great limits" on a contractual party's exercise of authorized discretion. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001). Under Florida law, "where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097-98 (Fla. Dist. Ct. App. 1999). Thus, unless no reasonable party would have made the same discretionary decision, EverBank acted in good faith and consistent with the Agreement. *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. Dist. Ct. App. 2000).

To be clear, Vathana has not expressly argued that defendants acted in bad faith, and even construing his pleadings liberally, he could not possibly prevail on any such argument. There is real no dispute that EverBank foresaw significant losses for its customers invested in ISK-denominated CDs, that it warned repeatedly of those potential losses, or ultimately, that those investors –

including Vathana – did in fact suffer losses.[4] As a result, and given the volatility of the ISK' value, plaintiff is not in a position to second-guess the bank's determination that immediate closure was "necessary." Vathana insists that EverBank could not have known whether it was limiting customers' losses or not due to the volatility in the value of the ISK and exchange rates at the time. He therefore questions whether it had the requisite belief that closure was necessary. His argument enjoys the benefit of hindsight, but insofar as he concedes that further losses were a definite possibility under the circumstances, his contention is ultimately without any merit. Under the circumstances, a reasonable party in EverBank's position would have believed immediate closure of deposit accounts was necessary. Although he also attempts to argue that EverBank was not itself facing any risk of loss, that contention, however implausible, is irrelevant because the uncontested evidence shows that EverBank had ample reason to form a good faith belief that immediate closure of its customers' deposit accounts was necessary to stem their losses.[5]

Vathana next suggests that EverBank could not properly invoke Paragraph 1.17 to terminate a customer's CD unless it terminated its entire relationship with that customer by closing all accounts. Otherwise, he maintains, the language requiring EverBank to "tender the account balance to [its customers] by mail" is mere surplusage. That argument is also unsupported by the text of Paragraph 1.17, and ultimately meritless. Obviously, EverBank need not entirely terminate its relationship with a given customer to send them the balance from a particular closed account. EverBank, of course, does not deny that it failed to mail all CD holders cash. It freely admits it deposited the proceeds into its customers' money market accounts or otherwise delivered the funds in accordance with their express instructions. (Gaffney Decl. in Supp. of Defs.' Mot. for Summ. J. ¶ 13).

The only question, then, is whether doing so constituted a material breach. To be material, "defendant's nonperformance must be such as to go to the essence of the contract; it must be the

---

[4] Although Vathana insists otherwise, he neglects to point to any evidence in the record showing that EverBank's customer's lost money. EverBank, by contrast, has submitted a declaration from its management substantiating investors' losses.
[5] For what it is worth, Vathana also appears to concede that under a worst case scenario, were it forced to rollover all ISK-denominated CDs, EverBank could have sustained losses of 12 million USD, amounting to roughly one-quarter of its annual net profits. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. 7:8-11).

type of breach that would discharge the injured party from further contractual duty on his part. A defendant's failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach." *Beefy Trail, Inc. v. Beefy King Intern., Inc.*, 267 So. 2d 853, 857 (Fla. App. 1972) (internal citation omitted). While the materiality of nonperformance is a question of fact, *Moore v. Chodorow*, 925 So. 2d 457, 461 (Fla. Dist. Ct. App. 2006), here there can be no serious question that EverBank's failure physically to mail class members cash was not a material breach. Vathana does not advance any reason why the form in which EverBank delivered his money had any significance. As a consequence, this claim cannot support Vathana's suit.

Finally, Vathana argues that Paragraph 1.17's allowance of unilateral termination is inconsistent with Paragraph 2.7.10, which sets forth the default rule of renewal for WorldCurrency CDs. Vathana attempts to find a contradiction in these terms, or at least ambiguity. Whether there is any ambiguity may be decided as a matter of law. *Smith*, 970 So. 2d at 451. Ambiguity exists if a word or phrase is reasonably subject to more than one meaning. *Id.* A finding of ambiguity precludes summary judgment. *Id.* Vathana maintains that "[t]he two provisions cannot be harmonized: if one finds that the contract is cancellable without cause, then the perpetual renewability is meaningless." Pl.'s Opp'n to Defs. Mot. for Summ. J. 19-21. He further insists that any ambiguity must be resolved in his favor, and against EverBank, as the Agreement's drafter.

As a matter of law, no ambiguity exists. Paragraph 2.7.10 sets forth the certificate holder's three options upon maturity, including a default rule of "automatic" renewal. In relevant part, it provides:

> …your WorldCurrency CD is automatically renewable; however, you may do one of the following options by providing instructions to the Trading Desk at least one week prior to the maturity date of the outstanding CD:
>    1. liquidate your account upon maturity.
>    2. remove the interest and re-invest the principal.
>    3. roll over the CD proceeds (principal plus interest).
> … If we do not receive maturity instructions from you at least one week prior to maturity, your CD will automatically renew, reinvesting your principal and any interest into a CD of the same currency and maturity, at the prevailing interest rate on the date of renewal.

(Agreement ¶ 2.7.10). The only reasonable reading of this language leads to the conclusion that investors "may" elect between three options at maturity. Significantly, Paragraph 2.7.10 does not

1 purport to be exhaustive, and says nothing whatsoever about EverBank's options at maturity. Thus, although Vathana strains to infer such an implied right, in doing so he simply ignores the rest of the Agreement, including Paragraphs 1.17 and 1.32, which directly pertain to EverBank's right of closure. More fundamentally, nothing in Paragraph 1.17 guarantees the certificate holder a right to "indefinite" or "perpetual" renewal, as Vathana seems to suggest. His proposed reading is simply unreasonable, as it has no basis in the actual language of the Agreement.

EverBank urges that "[w]hen interpreting a contract, a court should give effect to the plain and ordinary meaning of its terms." *Golf Scoring Sys. Unlimited, Inc. v. Remedio*, 877 So.2d 827, 829 (Fla. Dist. App. Ct. 2004). That is, "[w]ords should be given their natural meaning or the meaning most commonly understood in relation to the subject matter and circumstances, and reasonable construction is preferred to one that is unreasonable." *Id.* (citing *Thompson v. C.H.B., Inc.*, 454 So. 2d 55, 57 (Fla. Dist. Ct. App. 1984)). Applying that methodology to Paragraph 1.17, EverBank is authorized to close a customer's deposit account immediately and without prior notice, if necessary to avoid losses. To give that language meaningful effect, it must override other provisions found within the Agreement, including Paragraph 2.7.10. Because that is the only reasonable reading of the Agreement, plaintiff cannot prevail on his claim for breach of contract, and defendants' motion for summary judgment must be granted.

## V. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment must be granted and plaintiff's counter motion denied.

IT IS SO ORDERED.

Dated: 3/9/12

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE